1 | LIONEL Z. GLANCY (#134180)
  | MICHAEL GOLDBERG (#188669)
2 | GLANCY BINKOW & GOLDBERG LLP
  | 1801 Avenue of the Stars, Suite 311
3 | Los Angeles, CA  90067
  | Telephone:    (310) 201-9150
4 | Facsimile:     (310) 201-9160

5 | SUSAN G. KUPFER (#141724)
  | GLANCY BINKOW & GOLDBERG LLP
6 | 455 Market Street, Suite 1810
  | San Francisco, California 94105
7 | Telephone:    (415) 972-8160
  | Facsimile:     (415) 972-8166

8 | ERIC BELFI
9 | MURRAY FRANK & SAILER LLP
  | 275 Madison Avenue, Suite 801
10 | New York, New York 10016
  | Telephone:    (212) 682-1818
11 | Facsimile:     (212) 682-1892

12 | Attorneys for Plaintiff Thomas M. Hoosac

13 | **UNITED STATES DISTRICT COURT**
   | **NORTHERN DISTRICT OF CALIFORNIA**

14 |

15 | ─────────────────────────────── )   CIVIL ACTION NO.
   |                                )
16 | THOMAS M. HOOSAC, Individually and On )
   | Behalf of All Others Similarly Situated, )
17 |                           Plaintiff, )   05   4619   MJJ
   |                                )
18 |              vs.              )   **CLASS ACTION COMPLAINT**
   |                                )
19 | PIXAR, STEVEN P. JOBS, EDWIN E. )
   | CATMULL AND SIMON T. BAX,      )
20 |                                )
   |                           Defendants. )
21 | ─────────────────────────────── )   <u>JURY TRIAL DEMANDED</u>

22 |

23 |        Plaintiff, Thomas M. Hoosac ("Plaintiff"), individually and on behalf of all other

24 | persons similarly situated, by his undersigned attorneys, for his complaint against defendants,

25 | alleges the following based upon personal knowledge as to himself and his own acts, and

26 | information and belief as to all other matters, based upon, *inter alia*, the investigation

27 | conducted by and through his attorneys, which included, among other things, a review of the

28 | defendants' public documents, conference calls and announcements made by defendants,

United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pixar ("Pixar" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of persons who purchased or otherwise acquired the securities of Pixar between January 18, 2005 and June 30, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v], and Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

---

**PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, annexed hereto, purchased Pixar securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Pixar is a California corporation with its principal place of business and chief executive offices located at 1200 Park Avenue, Emeryville, CA 94608

8.      Defendant Steven P. Jobs was during the Class Period, Chairman and Chief Executive Officer of Pixar.

9.      Defendant Edwin E. Catmull was during the Class Period, President of Pixar.

10.     Defendant Simon T. Bax was during the Class Period Chief Financial Officer and Executive Vice President of Pixar.

11.     Defendants Jobs, Catmull and Bax are collectively referred to herein as the "Individual Defendants."

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

12.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Pixar between January 18, 2005 and June 30, 2005, or the Class Period, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

13.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pixar's securities were actively traded on the New York Stock Exchange ("NYSE").  According to the Company's last quarterly report filed with the SEC on August 11, 2005, the Company has 118,586,311 shares outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pixar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

14. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

15. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel that is experienced in class and securities litigation.

16. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pixar; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

17. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     On January 18, 2005, the first day of the Class Period, Pixar published a release announcing the imminent DVD release of *The Incredibles*.  This release stated, in part, the following:

> The world's greatest superhero family is coming to DVD! Box-office smash hit, THE INCREDIBLES, a Walt Disney Pictures presentation of a Pixar Animation Studios film, becomes even more incredible, arriving in a special two-disc Collector's Edition DVD March 15, 2005 from Buena Vista Home Entertainment and Pixar Animation Studios (Nasdaq: PIXR).  This hilarious, action-packed and heart-warming cinema sensation from the Oscar®-winning creators of Finding Nemo*, THE INCREDIBLES took moviegoers by storm. Now the Collector's Edition DVD takes viewers even further into the thrilling superhero world with an exclusive, all-new, never-before-seen animated short "Jack-Jack Attack," which uncovers Jack-Jack's previously unknown super powers and reveals what happened while Jack-Jack was alone for one truly outrageous night of babysitting.  A continuing hit with audiences of all ages in theatres, the exciting DVD release is loaded with explosive extras including a never-before-seen alternate opening, plus more deleted scenes, behind-the-scenes features on the film and its creators at Pixar Animation Studios, hilarious Incredi-blunders, bonus programs on the art and technology of the film, Pixar's charming short film "Boundin," which premiered with the movie in theaters, top-secret files on all the film's superheros, hysterical character interview, feature filmmaker commentary with Pixar director Brad Bird and his fellow filmmaker, and much more.
>
> **This heroic tale of laughs, adventure and heartfelt emotion delivers the most 'incredible' computer animated DVD experience ever and is available on DVD for $29.99 (S.R.P.) and on VHS for $29.99 (S.R.P.).** [Emphasis added.]

21.   Following this announcement, the price of Pixar common shares rallied — trading to over $44.00 per share on significant trading volume.

22.   On February 10, 2005, defendants published a release that announced Pixar's results for the fourth quarter and fiscal year ended January 1, 2005.  This release stated, in part, the following:

Pixar Reports Record Results for 2004

Pixar Animation Studios (Nasdaq: PIXR) today announced financial results for its fourth quarter and fiscal year ended January 1, 2005.  For the year, Pixar earned $141.7 million, or $2.38 per fully diluted share, on revenues of $273.5 million.  This compares to earnings of $124.8 million, or $2.17 per fully diluted share, on revenues of $262.5 million for the year ended January 3, 2004.

For the quarter, Pixar earned $55.2 million, or $0.91 per fully diluted share, on revenues of $108.9 million.  This compares to earnings of $83.9 million, or $1.44 per fully diluted share on revenues of $164.8 million, achieved in the fourth quarter of 2003.
"The stellar box office performance of The Incredibles, combined with the continuing success of Finding Nemo on home video, has resulted in our most profitable year to date," said Pixar CEO Steve Jobs.  "Looking ahead, The Incredibles' DVD will be the one to own when it hits shelves on March 15."

23.   Later that day, defendants Jobs and Bax hosted a conference call with analysts and investors during which they discussed the anticipated *The Incredibles* home video sales:

**I would now like to address the events that are to reflected in our results for the first quarter of 2005, as well as introduce our initial thoughts on the full year.**  We anticipate our earnings for the first quarter to be driven by the continuing success of The Incredibles, particularly its home video release which is slated for March 15th, 2005 in the U.S..  This is the first time since A Bug's Life in April of 1999 that we have released one of our films on home video outside the holiday period. But preorders of The Incredibles home video indicate that its domestic release will be equally as successful as that of Monsters, Inc.

**Looking ahead we expect continuing international home video revenues from The Incredibles to drive our results for the second quarter, particularly from its release in Japan, France, Germany and Australia.** Revenues from domestic pay TV licensing of the The Incredibles are expected in the third quarter, domestic free TV licensing of Finding Nemo in the fourth. Worldwide consumer product licensing and home video sales from our film library are likely to continue throughout 2005.

**In conclusion, 2004 stands out as our most successful year thus far. We posted record results that highlight a number of significant achievements. First, The Incredibles, our studio's sixth film, was released during a highly competitive** holiday season and is expected to generate over 625 million at the worldwide box office. Second, the continuing success of Finding Nemo illustrates the value of our films on DVD, the most profitable segment of the film business. And third, the solid performance of our library titles which delivered one-quarter of our revenues this year demonstrates the evergreen value of our film properties. **We expect this momentum to carry us into 2005 with the upcoming release of The Incredibles on home video and in 2006 with the release of Pixar's next film, Cars.** [Emphasis added.]

24.     Following publication of the February 10, 2005 release announcing the Company's purportedly strong results and guidance, predicated in substantial part on sales of *The Incredibles* home videos, the price of Pixar stock rallied — trading to over $45.00 per share on significant trading volume.

25.     Unbeknownst to investors, however, the statements in the preceding paragraphs were materially false and misleading because defendants knew, or recklessly disregarded, that their projections for the sales of *The Incredibles* home videos lacked any reasonable basis in fact. As noted in an article published in THE WALL STREET JOURNAL after the Class Period ended, five years ago, a new DVD release would realize approximately 33% of its total sales during the first week of release, with sales then mounting steadily over the following weeks and months. Under this scenario, with video home units distributed as

needed by retailers, returns may not have been a significant factor in calculating revenue. By the inception of the Class Period, however, it was readily apparent to defendants — each of whom was a seasoned veteran of the entertainment industry — that this pattern had changed dramatically, in large part because of the increase in new DVD titles being released on a regular basis.

26.     Moreover, by that time, as defendants also knew or recklessly disregarded, the DVD and home video market had already come to closely resemble the market for first-run movies, where the majority of sales occur in the first few days following release — before being knocked out by the next released title.  As a result of this trend, well before the inception of the Class Period, companies such as Pixar were not generating 33% of total sales during the first week of a home video's release, as they had previously, but between 50% and 70%. Accordingly, because of this important shift in sales trends, when sales of home videos slowed, the major retailers were quick to send the unsold copies back to studios to make room for new titles.

27.     Defendants' response to this pronounced change in the home video market was to flood the market with *The Incredibles* home video units during the first weeks of release in an attempt to maximize sales before *The Incredibles* videos were displaced by newer releases. This strategy required defendants to ship far more home video units than retailers would be able to sell.  For this reason, defendants knew or recklessly disregarded that, due to their flood-the-market sales strategy, and the then-prevailing home video market characterized by an early spike in sales followed by a sharp drop-off, the various rights of

return for Pixar's customers were, contrary to defendant's statements, critical in establishing

return estimates. Taking full advantage of the artificial inflation in the price of Pixar stock

caused by the publication of defendants' false and materially misleading statements, in late

February and early March 2005, Company insiders sold millions of dollars of their privately

held Pixar stock, as follows:

| Date | Insider | No. Shares Sold | Gross Proceeds |
|---|---|---|---|
| March 4, 2005 | Catmull, Edwin President | 40,000 | $1,850,044.00 |
| Feb. 25, 2005 | Lasseter, John A. Executive Vice President | 160,000 | $7,148,000.00 |
| Feb. 18, 2005 | Scali, Lois J. Executive Vice President | 10,000 | $451,000.00 |
| Feb. 17, 2005 | Catmull, Edwin President | 40,000 | $1,788,000.00 |
| Feb. 17, 2005 | Mcarthur, Sarah Executive Vice President | 20,000 | $894,000.00 |
| Feb. 15, 2005 | Scali, Lois J. Executive Vice President | 20,000 | $900,000.00 |
| Total: | | 310,000 | $19,942,044.00 |

28.    On March 16, 2005, defendants published a release announcing that the

Company had achieved one-day sales of at least 5 million units of *The Incredibles* DVD.

This release stated,

1

in part, the following:

2

3

**Walt Disney Pictures Presentation of a Pixar Animation Studios Film, THE INCREDIBLES, Sells Five Million Units on DVD and Video in First Day**

4

5

6

7

8

9

10

11

**On its first day of availability, Walt Disney Pictures presentation of a Pixar Animation Studios film, THE INCREDIBLES, sold five million units on DVD and video in North America,** it was announced today by Steve Jobs, chairman and chief executive officer of Pixar Animation Studios (Nasdaq: PIXR) and Bob Chapek, president of Buena Vista Home Entertainment (NYSE: DIS). **Fresh off the heels of winning two Academy Awards® [Best Animated Feature Film, Achievement in Sound Editing] the five million units sold to date has THE INCREDIBLES on track to be the best-selling DVD and video of 2005.**

12

13

14

"The superheroes at Pixar who created THE INCREDIBLES have made it even more thrilling in this extraordinary DVD release," said Pixar CEO Steve Jobs. **"We are gratified that millions of fans have rushed to add Pixar's latest film to their home entertainment collections."**

15

16

17

18

19

20

President of Buena Vista Home Entertainment, Bob Chapek added, "We're thrilled that the public has embraced the THE INCREDIBLES DVD and video in this wonderful way. We are working with our duplication facilities to keep up with consumer demand across North America." Commenting on the first day sales, Chapek added, "With the tremendous momentum from theatrical release and awards season **it is no surprise that audiences are continuing in their admiration for this wonderful film.**" [Emphasis added.]

21

22

23

24

25

29.     On or about March 17, 2005, defendants filed with the SEC the Company's year-end financial and operational report on a Form 10-K. The Form 10-K repeated many of the materially false and misleading statements identified herein, and also stated, in part, the following:

26

27

Revenue Recognition

28

We recognize film revenue from the distribution of all our animated feature films and related products **when earned and reasonably estimable** in

---

accordance with Statement of Position 00-2 "Accounting by Producers or Distributors of Films" (SOP 00-2). The following are the conditions that must be met in order to recognize revenue in accordance with SOP 00-2:

persuasive evidence of a sale or licensing arrangement with a customer exists;

the film is complete and, in accordance with the terms of the arrangement, has been delivered or is available for immediate and unconditional delivery;

the license period of the arrangement has begun and the customer can begin its exploitation, exhibition or sale;

the arrangement fee is fixed or determinable; and

collection of the arrangement fee is reasonably assured.

Under the Co-Production Agreement, we share equally with Disney in the profits of The Incredibles, Finding Nemo, Monsters, Inc., Toy Story 2 and A Bug's Life after Disney recovers its marketing, distribution and other predefined costs and fees. Our revenues for Toy Story are governed by the terms of the Feature Film Agreement under which Disney fully financed the production costs and shares a specified percentage of Toy Story profits with Pixar after certain agreed upon costs and fees are deducted. We recognize revenue from our films net of distribution fees, reserves for returns, and marketing and distribution expenses. Disney provides us with gross receipt information, return reserve information, marketing and distribution costs and any other fees and expenses. We utilize this information to determine our portion of the revenue by applying the contractual provisions included in our arrangements with Disney. **We may also adjust certain of Disney's estimates, such as home video returns and distribution expenses, based on Pixar's historical experience and other industry information. The amount of revenue recognized in any given quarter or quarters from all of our films depends on the timing, accuracy, and sufficiency of information we receive from Disney to determine revenues and associated gross profits. Although Disney provides us with the most current information available to enable us to recognize our share of revenue and determine our film gross profit, in the past we have made revisions, and we are likely to make revisions in the future, to that information based on our estimates and judgments.** Such information includes theatrical bad debt reserves and expenses, home video return reserves and expenses, merchandise expenses, and estimates for both revenues and related expenses resulting from differences between Disney's fiscal reporting period and ours.

For example, in the past, our theatrical revenues have been adjusted for our estimated reserves on potential uncollectible amounts to be received from theatrical exhibitors. Estimated reserves for uncollectible amounts are established based on a review of the industry, discussions with Disney, and our historical experience. To date we have not experienced significant losses, and therefore we have not had significant reserves for uncollectible receivables. The total allowance against our revenue for theatrical exhibitor uncollectible amounts approximated $2.2 million and $1.0 million at January 3, 2004 and January 1, 2005, respectively.

**We have also made adjustments to our home video revenues for estimates on return reserves that may differ from those reported by Disney. In determining our home video reserves for a particular title, we review information such as Disney's current return reserves, the historical return reserves for our previous titles, actual rates of returns, inventory levels in the distribution channel and other business and industry trend information that is available.** Disney has provided and may continue to provide us with reserve information that may differ substantially from our historical experience with our previous titles. Unless Disney provides a sufficient rationale as to why the market and sales performance are substantially different for a particular title, we have and may continue to record reserves more consistent with our historical experience. Our home video return reserves exceeded Disney's estimates by $27.8 million and $2.5 million at January 3, 2004 and January 1, 2005, respectively...

We have utilized margin normalization, such as with merchandise or home video expenses, in accordance with the provisions of SOP 00-2. This may result in the utilization of budgeted or forecasted information to calculate an ultimate lifetime expense margin, rather than actual costs incurred if it is deemed to be a more accurate reflection of our participation. Similar to return reserves, these expense estimates are reviewed and may be adjusted periodically to ensure that the most accurate depiction of our participation is reflected. [Emphasis added.]

30.    Unbeknownst to investors, however, at the time defendants filed the Company's Form 10-K, and throughout the Class Period, defendants had not made the necessary and proper adjustments based on actual experience, or "inventory levels in the

distribution channel." Rather, defendants shipped *The Incredibles* DVDs in volumes that far exceeded market demand, and failed to disclose their "flood-the-market" sales strategy, as well as the additional risks associated therewith.   In significant part, as a result of defendants' dissemination of materially false statements and omissions, shares of Pixar continued to trade at artificially inflated levels throughout the Class Period.

31.   On May 5, 2005, defendants published a release that announced results for the first fiscal quarter of 2005 ended April 2, 2005.   The release stated that the Company was "off to a terrific start" with "The Incredibles shaping up to be the best selling DVD of 2005":

Pixar Reports First Quarter Financial Results

Pixar Animation Studios (Nasdaq: PIXR) today announced financial results for its fiscal first quarter ended April 2, 2005. For the quarter, Pixar reported revenues of $161.2 million and earnings of $81.9 million, or $0.67 per diluted share.   These results compare to revenues of $53.8 million and earnings of $26.7 million, or $0.23 per diluted share, achieved in the year-ago quarter. These earnings per share calculations reflect the adjusted share count resulting from a 2-for-1 stock split, which took effect April 19, 2005.

**"We're off to a terrific start with The Incredibles shaping up to be the best selling DVD of 2005,"** said Pixar CEO Steve Jobs. "Cars is looking great, and we're also very excited about the ten year anniversary re-release of Toy Story on DVD this Fall." [Emphasis added.]

32.   Later that day, defendants Jobs and Bax hosted a conference call with analysts and investors during which they made the following additional remarks about the purported success of the Company's *The Incredibles* DVD sales:

**Our earnings of $0.67 per diluted share exceeded our split adjusted guidance of between $0.43 and $0.48. The main reason for the variance was higher than expected initial sales of the Incredibles DVD in the U.S. which resulted in $0.11 of EPS upside.** A further $0.04 related to revenues from Finding Nemo and the remaining $0.04 were from our library titles, particularly international television sales of Monsters Inc.

At the end of the quarter our shareholders equity was over 1.3 billion. Our cash and investments totaled 876 million and our accounts receivable had increased to 193 million. The majority of which reflects cash due from Disney for our share of film revenues primarily from sales of The Incredibles home video.

**Looking ahead to the second quarter we expect to report earnings per diluted share of approximately $0.15. The primary driver of these results will be international home video revenues from The Incredibles** due to its release in a number of territories including France, Germany, and Japan. We are not anticipating any material domestic shipments of the title over the next two quarters. However, we expect  The Incredibles home video to sell a similar number of units to Monsters Inc. over its life time [Emphasis added.]

33.    On or about May 12, 2005, defendants filed with the SEC the Company's quarterly report on a Form 10-Q.  The Form 10-Q, signed by defendant Bax and certified by defendants Bax and Jobs stated, in part, the following:

Basis of Presentation

The accompanying unaudited financial statements have been prepared is conformity with U.S. generally accepted accounting principles for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission.  **In the opinion of management, the accompanying unaudited financial statements reflect a ll adjustments, consisting only of normal recurring adjustments, considered necessary for a fair presentation of the financial condition, results of operations, and cash flows of Pixar for the periods presented.** These financial statements should be read in conjunction with he audited financial statements as of January 1, 2005, and for each of the years in the three-year period ended January 1, 2005, including notes thereto. These audited financial statements

are included in Pixar's Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 17, 2005.

Item 4. Controls and Procedures

Evaluation of disclosure controls and procedures. **Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q.** Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

Changes in internal control over financial reporting. **There was no change in our internal control over financial reporting that occurred during the period covered by this Quarterly Report on Form 10-Q that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.** [Emphasis added.]

34.     The Company's 1Q:05 Form 10-Q contained Certifications by defendants Jobs and Bax that the Company's financial statements were a complete and fair presentation of the Company's financial condition, results of operations and cash flows and contained no untrue statements of material fact, as follows:

EXHIBIT 31.2

CERTIFICATIONS

1.      I have reviewed this Quarterly Report on Form 10-Q of Pixar;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     **Designed such disclosure controls and procedures, or caused such**
**disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;**

b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.     Evaluated the effectiveness of the registrant's disclosure controls and
procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.     Disclosed in this report any change in the registrant's internal control
over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 12, 2005
/s/ STEVE JOBS
Steve Jobs
Chairman and Chief Executive Officer

\*          \*          \*

Date: May 12, 2005
/s/ SIMON T. BAX
Simon T. Bax

Executive Vice President and Chief Financial Officer
Exhibit 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Steve Jobs, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Pixar on Form 10-Q for the period ended April 2, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-Q fairly presents in all material respects the financial condition and results of operations of Pixar. [Emphasis added.]

| | |
|---|---|
| By: | /s/ STEVE JOBS |
| Name: | Steve Jobs |
| Title: | Chairman and Chief Executive Officer |
| Date: | May 12, 2005 |

**I, Simon Bax, certify, pursuant to 18 U. S. C. Section 1350, as adopted pursuant to Section 906 o f the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Pixar on Form 10-Q for the period ended April 2, 2005 fully companies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-Q fairly presents in all material r espects the financial condition and results of operations of Pixar. [Emphasis added.]**

| | |
|---|---|
| By: | /s/ SIMON T. BAX |
| Name: | Simon T. Bax |
| Title: | Executive Vice President and Chief Financial Officer |
| Date: | May 12, 2005 [Emphasis added.] |

35.     The statements contained in ¶¶ 20, 22-23, 28-29, and 31-34 above were each materially false and misleading when made and were known by defendants to be materially false and misleading, or were recklessly disregarded as such thereby, for the following reasons:

a.     defendants had intentionally flooded the market with millions of copies of *The Incredibles* home videos, far in excess of actual or forecast demand, in an effort to capitalize on a very narrow sales window;

b.     this flooding strategy had the effect of artificially inflating reported *The Incredibles* home video sales in the days immediately following its release, yet at the expense of future sales and with the effect of increasing foreseeable home video returns;

c.     as a direct result of this undisclosed flooding strategy, defendants exposed the

Company to significant undisclosed risks, including the risk that large numbers of unsold home video units would be returned to the Company;

d.     defendants' forecasts for the sale of *The Incredibles* home video units forecasts lacked any reasonable basis throughout the Class Period; and

e.     Pixar lacked an internal system of controls adequate for the purpose of preventing the dissemination of materially false and misleading information.

36.     In May 2005, defendants Bax and Catmull and other Company insiders sold millions of dollars more of their privately held Pixar stock, as follows:

| Date | Name | No. Shares Sold | Gross Proceeds |
|------|------|-----------------|----------------|
| May 18, 2005 | Catmull, Edwin President | 50,000 | $2,495,000.00 |
| May 18, 2005 | Lasseter, John A. Executive Vice President | 20,000 | $1,009,444.00 |
| May 13, 2005 | McArthur, Sarah Executive Vice President | 50,000 | $2,369,000.00 |
| May 11, 2005 | Lasseter, John A.& N.T. Executive Vice President | 30,000 | $1,500,000.00 |
| May 11, 2005 | Lasseter, John A. Executive Vice President | 10,000 | $475,000.00 |
| May 11, 2005 | Lasseter, John A. Executive Vice President | 10,000 | $474,559.00 |

| May 10, 2005 | Lasseter, John A. Executive Vice President | 40,000 | $1,936,000.00 |
| May 10, 2005 | Simon T. Bax Chief Financial Officer | 30,000 | $1,453,000.00 |
| May 10, 2005 | Scali, Lois J. Executive Vice President | 30,000 | $1,461,000.00 |
| Total: | | 270,000 | $13,173,003.00 |

## SCIENTER ALLEGATIONS

37.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Pixar, their control over, and/or receipt and/or modification of Pixar's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Pixar, participated in the fraudulent scheme alleged herein.

38.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The

ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

39.    Moreover, defendants were further motivated to conceal the information alleged herein in order to benefit the Company through positive credit ratings that permitted the Company to issue debt on terms more favorable to them than if the full information had been known by the market.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

40.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Pixar securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

42.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort

to maintain artificially high market prices for Pixar securities in violation of Section 10(b)

of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants

in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

43. Defendants, individually and in concert, directly and indirectly, by the use,

means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information about

the business, operations and future prospects of Pixar as specified herein.

44. These defendants employed devices, schemes, and artifices to defraud, while

in possession of material adverse non-public information and engaged in acts, practices, and

a course of conduct as alleged herein in an effort to assure investors of Pixar value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made about Pixar and its business

operations and future prospects in the light of the circumstances under which they were

made, not misleading, as set forth more particularly herein, and engaged in transactions,

practices and a course of business which operated as a fraud and deceit upon the purchasers

of Pixar securities during the Class Period.

45. Each of the Individual Defendants' primary liability, and control person

liability, arises from the following facts: (i) the Individual Defendants were high-level

executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

46.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Pixar's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

47. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Pixar securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Pixar's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Pixar securities during the Class Period at artificially high prices and were damaged thereby.

48. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Pixar was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Pixar securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

49. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

50.     Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as a direct and proximate result of defendants' wrongful conduct.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

52.     The Individual Defendants acted as controlling persons of Pixar within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

54.    As set forth above, Pixar and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

1.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

2.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.    Such other and further relief as the Court may deem just and proper.

1    3.  A warding P laintiff a nd t he C lass t heir r easonable c osts a nd e xpenses

2  incurred in this action, including counsel fees and expert fees; and

3

4    4.  Such other and further relief as the Court may deem just and proper.

5

6                          **JURY TRIAL DEMANDED**

7

8              Plaintiff hereby demands a trial by jury.

9  Dated: November 9, 2005              GLANCY BINKOW & GOLDBERG LLP

10                                       By:

11                                          Lionel Z. Glancy
                                            Michael Goldberg
12

13                                       1801 Avenue of the Stars, Suite 311
14                                       Los Angeles, California  90067
                                         Telephone:    (310) 201-9150
15                                       Facsimile:    (310) 201-9160

16
                                         GLANCY BINKOW & GOLDBERG LLP
17                                       Susan G. Kupfer
18                                       455 Market Street, Suite 1810
                                         San Francisco, California 94105
19                                       Telephone:    (415) 972-8160
20                                       Facsimile:    (415) 972-8166

21
                                         MURRAY FRANK & SAILER LLP
22                                       Eric Belfi
23                                       275 Madison Avenue, Suite 801
                                         New York, New York 10016
24                                       Telephone:    (212) 682-1818
25                                       Facsimile:    (212) 682-1892

26                                       Attorneys for Plaintiff

27

28

---

CLASS ACTION COMPLAINT

27

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**
**PIXAR SECURITIES LITIGATION**

I, Thomas M. Hoosac, certify that:

1.     I have reviewed the Complaint and authorized its filing.

2.     I did not purchase Pixar, the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.     My transactions in Pixar during the Class Period set forth in the Complaint are as follows:

I bought 108 shares on 05/11/2005 at $47.81 per share

I sold 108 shares on 05/11/2005 at $47.39 per share

5.     I have not served as a representative party on behalf of a class under this title during the last three years.

6.     I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 11-3-05

_____
(Please Sign Your Name Above)
Thomas M. Hoosac